**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA DOWLING, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 494 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anne Melissa Dowling,[1] in her capacity as Acting Director of the Illinois Department of Insurance, initiated liquidation proceedings in the Circuit Court of Cook County, Illinois for the Land of Lincoln Mutual Health Insurance Company, *In the Matter of Land of Lincoln Mutual Health Insurance Co.*, No. 2016 CH 9210. In that suit, she moved for declaratory relief against the Centers for Medicare and Medicaid Services, a federal agency within Defendant United States Department of Health and Human Services ("HHS"), concerning certain disputed offsets that HHS unilaterally took on funds owed to the Land of Lincoln. HHS removed the motion (Dkt. 1), and moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). (Dkt. 6). The Director opposed dismissal and moved to remand. (Dkt. 14). On August 25, 2017, the Court granted the Director's motion to remand and denied as moot HHS's motion to dismiss on the grounds that HHS failed to show that it could remove the matter under 28 U.S.C. § 1442(a). (Dkt. 36). HHS has moved for reconsideration. (Dkt. 38). For reasons stated in remand order as well as for the reasons stated below, the Court denies HHS's motion for reconsideration, including its request for a stay pending appeal.

---

[1] Since this case was filed in the Circuit Court of Cook County on December 23, 2016, Dowling was replaced as Acting Director of the Illinois Department of Insurance by Jennifer Hammer.

# BACKGROUND

To aid the discussion below, the Court lays out a more fulsome background than it provided in the remand order. (Dkt. 36). As a qualified nonprofit health insurance issuer under the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18042, Land of Lincoln Mutual Health Insurance Company ("Land of Lincoln") participated in three risk mitigation programs—the Risk Adjustment, Reinsurance, and Risk Corridor Programs—created by the ACA to incentivize insurers, in the form of subsidies, to provide health insurance to those previously deemed actuarially too risky. (Dkt. 1-1) at 2; (Dkt. 28) at 1–3. The Risk Adjustment Program is permanent, while the Reinsurance and Risk Corridor Programs were in effect for the years 2014, 2015, and 2016 only. (Dkt. 28) at 3 n.3.

Under the Risk Adjustment Program, insurers with below average actuarial risk—that is, healthier policyholders—are assessed fees, which are then in turn allocated to insurers with above average risk—that is, sicker policyholders. (Dkt. 1-1) at 2–3. The Risk Adjustment Program is budget neutral, allocating only as much as is assessed. *Id.* at 3. In 2014, Land of Lincoln received a net payment of $425,931 under the Risk Adjustment Program. *Id.* In 2015, Land of Lincoln was required to pay $31,823,450. As discussed in more detail below, this amount was never paid. *Id.*

The Reinsurance Program was funded by fees collected from all insurers and distributed to insurers that participated in the insurance exchanges based on need. (Dkt. 1-1) at 3–4. In 2014, Land of Lincoln received a net payment of $4,654,787 under the Reinsurance Program. *Id.* at 4. In 2015, Land of Lincoln was entitled to receive $16,302,241. *Id.* Land of Lincoln received payment of only $5,719,508. *Id.*

The Risk Corridor Program was intended to mitigate against increased premium prices caused by the influx of actuarially risky policyholders that were, prior to the passage of the ACA,

uninsured. (Dkt. 1-1) at 4–5. The Risk Corridor Program charged plans with larger than expected gains and made payments to plans with larger than expected losses.[2] From the start, however, the Risk Corridor Program had deficient funds.[3] In 2014, HHS determined Land of Lincoln was entitled to receive a net payment of $4,492,244 under this program, but Land of Lincoln received only $550,782. (Dkt. 1-1) at 5. In 2015, HHS determined Land of Lincoln was entitled to receive a net payment of $68,917,591, but Land of Lincoln received nothing. *Id.*

Due to significant net operating losses in 2015 (in excess of $90 million), Land of Lincoln was unable to make the nearly $32 million Risk Adjustment Program payment it owed without falling even further below Illinois' minimum risk-based-capital ratio. *Id.* In June 2016, HHS informed Land of Lincoln that all future payments owed to it would be offset by its outstanding Risk Adjustment balance. *Id.* On June 23, 2016, Land of Lincoln filed a lawsuit against the United States in the Court of Federal Claims seeking over $72 million in damages resulting from HHS's failure to make full Risk Corridor payments for 2014 and 2015. *See Land of Lincoln Mut. Health Ins. Co. v. United States*, 129 Fed. Cl. 81 (2016) (granting the Government's motion for judgment on administrative record and for failure to state claim), *appeal filed*, No. 17-1224 (Fed. Cir. 2016). In the meantime, Dowling, as the then-Acting Director of Insurance ("Director"), decided that Land of Lincoln's financial condition could be upended by its requirement to make the Risk Adjustment payment before receiving the Risk Corridor payments and therefore, on June 30, 2016, she informed HHS that she was exercising her authority under Illinois law to place Land of Lincoln under a "state solvency payment

---

[2] For further background, *see generally* Cynthia Cox, *et al.*, *Explaining Health Care Reform: Risk Adjustment, Reinsurance, and Risk Corridors*, KAISER FAMILY FOUNDATION (Aug. 17, 2016), https://www.kff.org/health-reform/issue-brief/explaining-health-care-reform-risk-adjustment-reinsurance-and-risk-corridors/.

[3] *See id.* (noting that in 2014, HHS paid out only 12.6% of risk corridor claims ($362 million of $2.87 billion) and that unpaid claims from 2014 were to be paid from 2015 risk corridor collections, and any shortfalls from 2015 claims covered by 2016 collections in 2017).

restriction." This effectively prohibited HHS from "offsetting" future payments and required HHS to disburse to Land of Lincoln the outstanding Risk Corridor payments prior to Land of Lincoln making any the Risk Adjustment payments owed. (Dkt. 1-1) at 6. However, on July 11, 2016, HHS notified the Director that all future payments owed to Land of Lincoln would be offset by its outstanding Risk Adjustment liability. *Id.* at 7.

On July 14, 2016, the Director, exercising her authority under state law, entered into an agreed order of rehabilitation with Land of Lincoln in the Circuit Court of Cook County, Chancery Division. *Id.* at 7. Pursuant to the order of rehabilitation, the state court enjoined "[a]ny and all claimants and creditors of Land of Lincoln . . . whether an individual . . . [or] government entity . . . from setting off or netting monies owed Land of Lincoln without the prior leave of this Court." *Id.* at 8. A copy of the court's order was sent by the Director to HHS on July 15, 2016. *Id.* at 9. On August 18, 2016, HHS reported to Land of Lincoln that it was withholding over $13 million in Reinsurance and other payments, applying that amount instead to Land of Lincoln's outstanding Risk Adjustment account. *Id.* at 9–10. On September 29, 2016, the state court entered an agreed order of liquidation; Land of Lincoln ceased operations as of October 1, 2016. *Id.* at 10.

The Director filed a motion for declaratory relief on December 23, 2016, seeking the state court to declare that HHS violated the rehabilitation order by unilaterally offsetting money owed to Land of Lincoln without first getting leave of the court. *See* (Dkt 1-1). The Director further requested the court, if it found HHS violated the order, to "provide her with leave thereafter to seek an appropriate remedy if necessary or schedule a hearing on whether to allow [HHS's] offsets." *Id.* at 1. In other words, the Director did not ask the state court to order that HHS release the funds, but only to declare that HHS had violated the court's order.

HHS removed the motion for declaratory relief on January 23, 2017, pursuant to 28 U.S.C. § 1442(a). (Dkt. 1). Shortly thereafter, HHS filed a motion to dismiss for lack of subject matter jurisdiction (Dkt. 6), and the Director moved to remand the case to state court. (Dkt. 14). In its August 25, 2017 Order, the Court remanded the case to state court, finding that a motion for declaratory relief in a liquidation proceeding was not an "ancillary proceeding" within the meaning of § 1442. (Dkt. 36) at 3. The Court further found that the state court proceeding was not a "civil action . . . against or directed to" the United States or any agency or officer thereof within the meaning of § 1442, because the underlying action constitutes a liquidation proceeding and merely involves the United States as a creditor with an interest in the insolvent estate. *Id.* at 4. HHS has moved for reconsideration of the Court's remand order. (Dkt. 38). The parties came before the Court on February 28, 2018 for status on the reconsideration motion, and the Court notified them orally that HHS's motion to reconsider was denied. After the parties presented lengthy arguments concerning HHS's request for a stay of the remand pending appeal to the Seventh Circuit, the Court permitted the parties to submit additional position papers on the issue and deferred its written ruling to fully consider the stay issue, which was not addressed in substance in HHS's reconsideration briefing. (Dkt. 47). The parties submitted their position papers (Dkts. 48, 49), and the Court's ruling is as follows.

## RECONSIDERATION

### A.    Legal Standard

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (internal citations omitted); *see also Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("A motion for

reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension," but "such problems rarely arise and the motion to reconsider should be equally rare.") (internal citations omitted). "Rule 59 is not a vehicle for rearguing previously rejected motions," or to "rehash old arguments." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). "Disposition of a motion for reconsideration is left to the discretion of the district court, and its ruling will not be reversed absent an abuse of that discretion." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

**B.      Remand**

HHS seeks reconsideration of the order remanding the case to state court, arguing that the "theory adopted by this Court had not been raised or briefed by the parties and the decision represents an incorrect and unexpected application of the plain text of § 1442." (Dkt. 38) at 2. However, as the Director correctly points out ((Dkt. 42) at 3–4), the reasoning relied on by the Court was raised by the Director (*see* (Dkt. 24) at 20–21 & n.8), and was responded to by HHS in its reply brief. (Dkt. 28) at 16–17. In addition, recognizing the complexity of the jurisdiction question at hand, the Court finds no manifest error of law in its earlier conclusion that HHS failed to meet its burden of showing that this matter is removable under § 1442(a). Through its motion for reconsideration, HHS does little more than rehash arguments from its prior briefing and in doing so, HHS fails to demonstrate manifest error in Court's remand order concluding that Congress did not intend to permit the removal of matters such as the Motion for Declaratory Relief in a liquidation proceeding as an "ancillary proceeding" within the meaning of § 1442. *See Oto*, 224 F.3d at 606 ("manifest error" is not demonstrated by the disappointment of the losing party, but instead by disregard, misapplication or failure to recognize controlling

precedent). However, even if this holding was in error as HHS argues, this matter still would be remanded to state court on other grounds raised and argued at length in the initial briefing (*see* (Dkts. 14, 24, 25, 28, 29)): concerns of comity and fairness set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and the strong federal policy of deferring to state regulation of the insurance industry, as reflected by the McCarran-Ferguson Act, 15 U.S.C. §1011, *et seq.*

## C.    Abstention

"Because its analysis provides the closest fit, *Burford* has become the doctrine of choice in analyzing whether to abstain in favor of state insurance liquidation and rehabilitation proceedings." *Prop. & Cas. Ins. Ltd. v. Cent. Nat'l Ins. Co. of Omaha*, 936 F.2d 319, 321 (7th Cir. 1991) (citing *Gen. Railway Signal Co. v. Corcoran*, 921 F.2d 700, 708 (7th Cir. 1991) (collecting cases)). However, in conducting an abstention analysis, it is useful to remember that "the dividing lines between various types of abstention are by no means impermeable." *Prop. & Cas. Ins.*, 936 F.2d at 321–22 (explaining that the court's "analysis generally follows *Burford* but will borrow from other abstention analyses when appropriate"); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18 (1976) (federal courts may exercise their discretion and abstain to avoid duplicative, "piecemeal" litigation of a matter more properly decided in a parallel state court proceeding). In *New Orleans Public Serv. Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989), the Court identified two distinct instances when *Burford* abstention was appropriate:

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* at 361; *see Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 504 (7th Cir. 2011). "In other words, federal courts may abstain when principles of federalism warrant deference to a state's regulatory regime." *Adkins*, 644 F.3d at 504.

Even if properly removed, this case would present the second type of *Burford* abstention. There are "two essential elements of *Burford* abstention. First . . . the state must offer some forum in which claims may be litigated . . . [and s]econd, that forum must be special—it must stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims." *Prop. & Cas. Ins.*, 936 F.2d at 323 (remanding to the district court to determine whether Nebraska had the type of specialized creditor claims proceeding to which *Burford* abstention appropriately was applied).

Looking specifically at the insurance industry, in *Hartford Casualty Insurance Co. v. Borg-Warner Corp.*, 913 F.2d 419 (7th Cir. 1990), the Court of Appeals applied the second type of *Burford* abstention to a case involving a state insurance rehabilitation proceeding. The court elucidated four criteria to help determine whether a federal court should exercise its jurisdiction within the context of this industry: (1) whether the suit is based on a cause of action that is exclusively federal; (2) whether the suit requires the court to determine issues that are directly relevant to state policy in the regulation of the insurance industry; (3) whether state procedures indicate a desire to create special state forums to regulate and adjudicate the issues; (4) whether there are difficult or unusual state laws at issue. *Id.* at 425 (citing *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 704–05 (10th Cir. 1988)). Considering these factors, the *Hartford* court ultimately determined that *Burford* abstention was appropriate because "[w]ith the McCarran-Ferguson Act stating congressional policy that insurance regulation is up to the states, it is difficult to

understand how . . . a federal court should entertain a lawsuit where it will have to decide the amount and existence of liability that an insolvent Illinois insurer owes." *Id.* at 426.

Examining those same four criteria here, the Court believes that abstention would be appropriate. States have a great interest in maintaining a uniform insurance liquidation process that provides strong protection to policyholders and Congress has expressed a strong desire to avoid federal interference in those proceedings in the McCarran-Ferguson Act, as is discussed in greater detail below. *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 502 (1993); *Hartford Cas. Ins. Co.*, 913 F.2d at 426; *Blackhawk Heating & Plumbing Co. v. Geeslin*, 530 F.2d 154, 159–60 (7th Cir. 1976); *see also Mountain Funding, Inc. v. Frontier Ins. Co.*, 329 F. Supp. 2d 994, 999 (N.D. Ill. 2004) (abstention appropriate where insurance liquidation proceeding was adjudicating all claims against defendant in detailed and uniform manner); *Gen. Railway Signal Co.*, 921 F.2d at 708 (stating, in dicta, that "abstention from the exercise of federal court jurisdiction . . . over claims arising out of such state liquidation proceedings is particularly appropriate"). This is an insurance insolvency case, which arises out of state law—HHS seeks only to raise federal law defenses. The Illinois Insurance Code permits the state court presiding over liquidation proceedings to enjoin parties that threaten the liquidation proceeding, namely, by upsetting the marshaling of funds for later distribution to policyholders and creditors. *See* 215 ILCS 5/189. Removal of (and subsequent disposal of) this matter will ultimately be disruptive of the state's efforts to establish a single, efficient, and uniform system of rehabilitating and liquidating insolvent insurance companies by encouraging the federal government to remove piecemeal portions relating to federal interests. And HHS does not argue with any force that its claims and defenses cannot be heard in the liquidation proceeding; there is no reason for the Court to believe that HHS cannot effectively raise its legal arguments before the Chancery Court.

Further support for abstention can be found in the Illinois Insurance Code, 215 ILCS 5/199, which provides: "In the event an order is entered directing liquidation, rehabilitation or conservation, the Director may remove the property and assets of the company to the county of Sangamon or to the county of Cook." In *Burford*, the Court found abstention appropriate largely because Texas had set up an oil and gas regulatory scheme in which a single state circuit court heard lawsuits challenging decisions from a state commission charged with enforcing extraction quotas. *Burford*, 319 U.S. at 326. The Court noted that the scheme allowed for the state court to develop expertise in the field and promote efficiency and consistency. *Id.* at 327 (noting that where the state court "can give fully as great relief, including temporary restraining orders, as the federal courts," "delay, misunderstanding of local law, and needless federal conflict with the State policy, are the inevitable product of [the exercise of federal jurisdiction]"). Here too, Illinois permits the Director to consolidate insurance rehabilitation and liquidation proceeding state-wide in one of two circuit courts (Sangamon or Cook County), and avail herself of judges experienced in insurance matters and to promote efficiency and consistency. Illinois has the type of "special forum" that provides "technical oversight or concentrated review" of insurance rehabilitation and liquidation proceedings that makes abstention appropriate over the Director's motion for declaratory relief.

The McCarran-Ferguson Act (the "Act"), 15 U.S.C. §1011, *et seq.*, also supports this analysis. As relevant, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . ." 15 U.S.C. § 1012. In other words, the Act prevents generally applicable federal laws from interfering with state insurance regulations. *See Am. Deposit Corp. v. Schacht*, 84 F.3d 834, 837–38 (7th Cir. 1996) ("state laws enacted for the purposes of

10

regulating the business of insurance do not yield to conflicting federal statutes unless federal statutes specifically provide otherwise") (citing *Fabe*, 508 U.S. at 500–01); *see also Ophthalmic Mut. Ins. Co. v. Musser*, 143 F.3d 1062, 1067 (7th Cir. 1998).

Illinois has adopted a comprehensive statutory system to regulate the business of insurance. In particular, the state law at issue here is Title XIII of the Illinois Insurance Code, 215 ILCS 5/187, *et seq.*, which grants broad power to the Illinois Director of Insurance to, among other things, rehabilitate and liquidate domestic insurance companies that are insolvent, or otherwise. *See, e.g.*, 215 ILCS 5/188. The state law governing the state court liquidation proceeding is clearly related to the business of insurance, to the extent that their purpose is to protect policyholders by securing payment of their claims. *See Fabe*, 508 U.S. at 502 (state creditor-priority statutes that are enacted "to ensure that, if possible, policyholders ultimately will receive payment on their claims," relate to the business of insurance); *id.* at 505–06 ("The primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies."); *Hartford Cas. Ins. Co.*, 913 F.2d at 426 (noting that "[i]t is the states that have the paramount interest in an uniform insurance rehabilitation process"); *Blackhawk Heating & Plumbing Co.*, 530 F.2d 159–60 (noting that the state's paramount interest "is of even greater importance when the company undergoing liquidation is a domestic insurance company," because "[t]he interests of the company's owners, policyholders, and creditors, as well as the public, are best served and protected by an orderly and efficient process of liquidation" and noting that "[f]ederal courts should refrain from deciding select issues confronting another court in pending proceedings"). HHS makes an interesting argument in its stay position paper that the ACA is itself a "federal regulation of insurance" that cannot be

subject to reverse-preemption, but this argument is not further developed. *See* (Dkt. 48) at 6. *But see Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014) (the McCarran-Ferguson Act "gives states preeminence in the domain of insurance regulation"). Regardless, and without venturing into the issue of whether Act reverse-preempts the removal statute, the Court recognizes the strong policy in favor of deferring to Illinois for the regulation of insurance. Piecemeal removal of this state insurance liquidation proceeding undoubtedly is disruptive to state efforts to establish a coherent policy with respect to insurance. Specifically, it would impair the comprehensive regulatory scheme for the rehabilitation and liquidation of defunct domestic insurance companies by frustrating the Director's ability to marshal the remaining funds and pay policyholders and creditors. Thus, the Act further weighs in favor of abstention.

As a final point in favor of abstention, the Court notes that the Director seeks a declaration that HHS violated an earlier state court injunction—an order that barred *all* of Land of Lincoln's creditors from offsetting (or netting) future payments to the entity. Ostensibly, this is common practice in state insurance rehabilitation and liquidation actions to consolidate all of the distressed company's assets and to ensure creditors are paid pursuant to state law dictating priority. *See* 215 ILCS 5/205 (laying out the priority of distribution of general assets of a liquidated Illinois insurance company). Injunctions of this sort are meant to prevent creditors from circumventing priority statutes—in essence, getting paid without getting in line—depriving higher priority creditors from money they are otherwise entitled to. What the Director is *not* seeking is a declaration that HHS owes it millions of dollars in delinquent Risk Corridor payments, which is the subject of the case currently before the Federal Circuit Court of Appeals.

The *Hartford* court, in applying *Burford* abstention, recognized the importance to keeping liquidation proceedings together in state court:

> In effect, Hartford is attempting to jump ahead of Centaur's other creditors by filing a lawsuit outside the state rehabilitation proceedings . . . . For a federal court to hear Hartford's present claim, however, it would have to determine the deficiency that Centaur will owe—an issue that will also be decided in the state rehabilitation court. The probability of inconsistent decisions between the state and federal systems would lead to incongruous results, with Hartford perhaps receiving more than it should have been entitled to receive. Allowing suits similar to Hartford's action to proceed would lead to a system where the states would not control the ultimate distribution to creditors of insolvent insurers. Such a federal usurpation of state control over insolvent insurers would be inconsistent with the McCarran-Ferguson Act and general notions of comity.

*Hartford Cas. Ins. Co.*, 913 F.2d at 426. In sum, even if the Court had not remanded the case to the Circuit Court of Cook County based on its interpretation of the removal statute, all of the considerations discussed herein weigh in favor of abstention.[4]

## STAY PENDING APPEAL

At the conclusion of its motion for reconsideration, HHS requested the Court stay any order remanding the case to state court "pending appeal if the Solicitor General authorizes appeal." (Dkt. 38) at 9. HHS supported its request for a stay with a single perfunctory sentence: "A stay pending appeal is appropriate to allow the Seventh Circuit the opportunity to consider

---

[4] In support of its previous motion to dismiss (Dkt. 6), HHS cited *Porch-Clark v. Engelhart*, 930 F. Supp. 2d 928 (N.D. Ill. 2013), for the proposition that remand of "a case to state court after determining that federal law barred the state court from proceeding in the case would . . . be 'a vacuous act'" because "the federal law that deprives the federal court of jurisdiction also deprives the state court of jurisdiction." *Id.* at 938. But without reaching the merits of HHS's motion to dismiss, which advocates for dismissal on the basis of the derivative-jurisdiction doctrine, the Court notes that *Porch-Clark* is distinguishable. Originally filed in state court asserting only state-law causes of action, *Porch-Clark* was removed to federal court, where the defendant promptly filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim; the plaintiff moved for remand. *Id.* Antecedent to the court's decision to dismiss the case rather than remand it to state court was a determination that federal law, Title IV of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), completely preempted state-law challenges to union elections. *Id.* at 936 ("Even if state law, by its own terms, provided a vehicle for Plaintiffs' challenge to the election results, the LMRDA's complete preemption precludes those claims."). Although HHS's sovereign-immunity defense is an absolute defense to the liquidation proceeding, which it may raise there, it does not bar the state court from proceeding in general and *Porch-Clark* does not prevent remand.

the legal issues presented before any remand is implemented." *Id.* In response, the Director devoted four pages to the issue. (Dkt. 42) at 11–15. And yet, HHS provided no additional support for the stay request in its reply brief nor rebutted any of the Director's arguments. (Dkt. 43). At the February 28, 2018 status hearing, the Court orally notified the parties that HHS's motion to reconsider was denied. (Dkt. 47). Lengthy oral argument was heard on the issue of stay pending appeal, at the conclusion of which the Court requested the parties submit additional briefs on the matter. (Dkts. 48–49). The Court has reviewed the parties' position papers on the issue of a stay and for the foregoing reasons HHS's request for a stay pending a potential appeal is denied.

### A.  Legal Standard

There is a four-part test to determine whether a stay pending appeal is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006); *In re Heotis*, 2017 WL 4310513, at *2 (N.D. Ill. Sept. 28, 2017). "A stay is not a matter of right . . . . It is instead an exercise of judicial discretion . . . [that] is dependent upon the circumstances of the particular case." *Nken,* 556 U.S. at 433 (internal citations and quotations omitted). The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction, because stays, like preliminary injunctions, are necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits. *In re Heotis*, 2017 WL 4310513, at *2. As with a motion for a preliminary injunction, a "sliding

scale" approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa. *Id.* (quoting *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014)). Ultimately, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433.

## B. Likelihood of Success on the Merits

"It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434–35. Therefore, HHS "need[s] to demonstrate a substantial showing of likelihood of success, not merely the possibility of success, because they must convince the reviewing court that the lower court, after having the benefit of evaluating the relevant evidence, has likely committed reversible error." *Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997). HHS posits that the Court got it wrong in the original remand order—that the plain language of § 1442 supports removal of this matter to federal court and once there, dismissal for lack of subject matter jurisdiction. (Dkt. 48) at 4. Admittedly, this case involves complex issues of federal jurisdiction and statutory interpretation and the Court did not arrive at its conclusion lightly. Nevertheless, the this case must be remanded to state court because Congress did not intend to permit the removal of matters such as Motion for Declaratory Relief in a liquidation proceeding as an "ancillary proceeding" within the meaning of § 1442; and even if this matter were properly removed, abstention is appropriate because of the "the exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy" in state insurance rehabilitation and liquidation matters. *New Orleans Public Serv. Inc.*, 491 U.S. at 361. HHS has failed to meet its heavy burden of demonstrating the Court likely committed reversible error in arriving at these conclusions.

### C.     Balance of Harms

The second and third factors require the Court to balance the harm of a stay to the opposing party with the harm in the absence of a stay to the proponent.  A movant's fear of harm occurring that is only speculative is insufficient to meet the definition of an irreparable injury.  *In re Heotis*, 2017 WL 4310513, at *5 (citation and quotation omitted).  "Not only must the harm alleged rise above being speculative in nature, but to be considered irreparable, economic injury alone is ordinarily not enough."  *Id.*

HHS argues that it will suffer two distinct irreparable injuries absent a stay.  First, HHS argues that the denial of a stay will undermine (or be inconsistent with) the policy embodied in 28 U.S.C. § 1447(d), which specifically permits an appeal of "an order remanding a case to the state court from which it was removed pursuant to section 1442 . . . ."  According to HHS, the direct access to an appeal by a federal actor under § 1447(d) "underscores the sovereign and institutional interests at stake in denying a federal actor's removal request when a state court order is sought against it," and that "[d]enying a stay subverts this policy and inflicts the irreparable harm that §§ 1442 and 1447(d) seek to avoid—deprivation of the federal forum." (Dkt. 48) at 4.  But denial of a stay during appeal does not injure HHS's "sovereign and institutional" interests that are purportedly embodied in § 1447(d), yet alone irreparably injure them.  Nothing in the language of § 1447(d) militates in favor of a stay pending appeal. Congress merely provided the Government or its Officers the right to appeal a district court's order remanding a case removed from state court under § 1442 or § 1443, a right denied parties seeking to remove to federal court on diversity grounds.  And it was only with the 2011 amendment to § 1447 that an order remanding a case removed under § 1442 was granted a direct right of appeal.  While there can be no doubt that HHS may appeal this order remanding the case

to state court pursuant to the 2011 amendment, the overall policy embodied in § 1447(d) remains unchanged: "Congress . . . established the policy of not permitting interrupting of the litigation of the merits of a removed cause by prolonged litigation of questions of jurisdiction of the district court to which the cause is removed." *United States v. Rice*, 327 U.S. 742, 751 (1946). Had Congress seen fit, it could have required district courts to stay order remanding a case removed under §1442, but it did not. Moreover, HHS may move the appellate court for a stay pending its decision if it chooses to appeal. *See* Fed. R. App. P. 8(a)(2)(A)(ii).

Second, HHS contends that on remand, an adverse judgment against it in the state liquidation proceeding "could cast doubt on HHS's administration of the risk-adjustment program and create uncertainty for issuers that depend on the integrity of this program," because "the risk-adjustment charges owed by Land of Lincoln and collected by HHS via offset have already been paid to other issuers in the Illinois market . . . ." (Dkt. 48) at 5 (citing *Gerhart v. HHS*, 2016 WL 8839016 at *8 (S.D. Iowa Aug. 12, 2016)). In other words, HHS raises the specter that an adverse ruling against it in the state liquidation proceeding will call into question the validity of the Risk Adjustment Program and the ACA as a whole by preventing it from enforcing its own regulations, particularly those relating to netting or offsetting. As is evident, this argument is based on speculation and fear that the state court will reject all of the defenses HHS raises there and rules against it. This is insufficient to establish irreparable harm in this analysis. *In re Heotis*, 2017 WL 4310513, at *5; *see also* 11A Charles A. Wright *et al.*, Federal Practice & Procedure § 2948.1 (3d ed.) ("Speculative injury is not sufficient; there must be more than an unfounded fear.").

For this point, HHS relies on *Gerhart v. HHS*, 2016 WL 8839016 (S.D. Iowa Aug. 12, 2016). As an initial matter, the posture of the parties in *Gerhart* was substantively different than

presented here. In *Gerhart*, the plaintiff-liquidator filed a motion for preliminary injunction and declaratory judgment in federal court seeking relief that would require HHS to engage in Iowa state court proceedings; therefore, the liquidator, not HHS, bore the burden of proof to establish an irreparable harm. On this point, the court found that the liquidator's alleged harms—inability to conduct the liquidation process and prejudice to other creditors (similar to the arguments made by the Director here)—was not irreparable as required for preliminary relief, particularly because money damages for retroactive payments would be sufficient to address them. *Id*. at *7–8. The court noted that the injunctive relief could be denied on this basis alone, but continued to balance the harms presented by both parties. In doing so, the court found that the harm to HHS in the interrupted administration of the ACA was greater than the harm presented by the liquidators. *Id*. at *8. Even if the Court were to adopt the reasoning in *Gerhart* regarding the balancing of the harms, the point remains that—as discussed above—HHS has not carried its burden to demonstrate that any *irreparable* harm will result absent a stay pending its potential appeal to the Seventh Circuit. Even the *Gerhart* court noted that the harm to HHS there was HHS's potential inability to collect payments from the bankrupt insurance company which would have been "burdensome" and which would have "hamper[ed] the administration of the risk adjustment program in Iowa and of the ACA as a whole." *Gerhart*, 2016 WL 8839016, at *8. Even this language does not suggest an irreparable injury that lacks any remedy at law.

In refuting the Director's claim of hardship and in support of a stay, HHS cites to a case in which it claims the liquidator's interests "are not meaningfully different" from the Director's interests here: *Farmer v. United States*, No. 17-363C (Dkt. 9) (Ct. Cl. June 7, 2017), where in the Court of Federal Claims granted the government's motion to stay the proceedings. But the circumstances under which the stay was granted in *Farmer* are markedly different from those

faced by the Director and HHS in the present matter. In *Farmer*, the insurance-liquidator plaintiffs are seeking the recovery of approximately $92 million in Risk Corridor payments. After the case was filed, the government nearly immediately moved for a stay of the proceedings pending the Federal Circuit's forthcoming decisions in two on-point cases—the relevance of which was not disputed by either party in *Farmer*. "[G]iven the symmetry of issues involved" and the "advanced stage" of the appeals at issue, the court granted the stay because it would "serve the valuable purpose of preserving the resources of both the parties and the court. These cases will proceed more efficiently and more productively with the forthcoming guidance from the Federal Circuit." *Id.* at 3. Although the liquidators in *Farmer* and the Director here may have similar interests, the circumstances underlying the stay requests in that case and this case are so different that the reasoning in *Farmer* is wholly inapplicable. For one thing, the stay in *Farmer* was said to promote efficiency and conservation of resources; a stay in this proceeding would have the opposite effect.

Here, the state court still must adjudicate the motion for declaratory relief filed by the Director. As the Director points out in her stay position paper, the next step following a declaration in state court could be a hearing to determine if HHS should be allowed to offset the credits as it did, offset the credits and debts differently, or not. (Dkt. 49) at 5. Even assuming the possibility that the state court enters an adverse judgment against it, HHS may avail itself of the state appellate process, and ultimately seek review by the Supreme Court. In addition, it may seek direct appeal of this Order by the Seventh Circuit. Accordingly, HHS's alleged harm is neither immediate nor irreparable. The harm alleged by the Director includes further impairing the efficient administration of the liquidated estate to the detriment of Land of Lincoln's former

policyholders, as discussed below. Considering the alleged harms, the balance tips in favor of the Director.

### D. Public Interest

At the time the Director filed her state court motion for declaratory relief, HHS had set-off over $13 million that otherwise would have been paid to the estate and subsequently to policyholders that incurred additional deductible and co-payments as a result of Land of Lincoln insolvency three months prior to the end of the plan year. (Dkt. 49) at 12–13. HHS has continued to offset payments, and has now withheld a total of more than $27 million. *Id.* The projected outstanding claims for reimbursement made by former Land of Lincoln policyholders totals some $50 million. In the absence of the offset amount, the Director only has been able to distribute approximately 25% of the claim payments to date. *Id.* There is a concrete public interest in continuation of the liquidation proceedings to ensure those policyholders that were forced to endure additional healthcare expenses as a result are compensated. For brief background, Land of Lincoln entered into liquidation three months prior to the end of the policy year, requiring policyholders to find coverage for the remainder of that year. (Dkt. 42) at 13–14. Some policyholders were placed in the unenviable position of finding short-term health coverage and restarting their co-payment and deductible amounts from zero. In contrast, the Court finds public interest invoked by HHS harder to wrap its head around—that somehow an adverse ruling in a state liquidation proceeding will bring the entire insurance market to its knees. (Dkt. 48) at 8–9. The line of causation is too tenuous. Thus, this factor weighs in the Director's favor.

### CONCLUSION

For the reasons stated above, Defendant HHS's motion to reconsider (Dkt. 38), including its request for a stay pending appeal, is denied. The case remains remanded to the Circuit Court

of Cook County. The clerk of the court will transmit the file to the Circuit Court of Cook County.

Hon. Virginia M. Kendall
United States District Judge

Date: July 2, 2018